AFFILIATED ENTERPRISES, INC., PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket No. 96603.   Promulgated July 19, 1940.

*Albert J. Gould, Esq.*, for the petitioner.
*R. P. Hertzog, Esq.*, for the respondent.

394

OPINION.

HARRON: *Issue 1—Compensation for personal services.*—Under section 23 (a) of the Revenue Acts of 1934 and 1936 a taxpayer may deduct as business expense all *ordinary and necessary expenses* paid or incurred, including a reasonable allowance for salaries or other compensation for personal services actually rendered. The respondent has made a determination, which is prima facie correct, that a reasonable allowance for compensation for the personal services of Clover Yaeger is $1,200 and $600 for 1935 and 1936, respectively. He has disallowed in full deductions claimed for sums paid to Maizie Ricketson for the services performed by her. The burden is upon petitioner to introduce evidence to overcome the prima facie correctness of respondent's determination.

Petitioner relies upon the facts as set forth in the findings of fact to sustain the burden of proof upon it to show that a reasonable allowance for compensation for the two officers in question, for purposes of deduction under section 23 (a), is a total of $19,500 for 1935 and $33,800 for 1936, as claimed on the returns for those years. This proceeding has been submitted on a stipulation of facts. As stipulated, the facts show that each of the individuals in question rendered services to petitioner in each taxable year, but the facts do not show how much time each individual devoted in the respective services; and they provide little by which to measure the value to petitioner of the services performed. The question requires determination of what is a *reasonable* allowance as an ordinary and necessary business expense for compensation for the services actually rendered by each of the persons involved.

Both persons rendered some services to petitioner in each taxable year, the nature of which is not as fully described, as we think it should be; and Clover Yaeger's services were more extensive than those of Maizie Ricketson. The evidence also shows that each was a stockholder and director; that each was a wife of one of the two men who built up petitioner's business; that the board of directors comprised C. U. Yaeger, Rick Ricketson, Clover Yaeger, and Maizie Ricketson; that the undivided profits of petitioner, according to balance sheets, were $14,855 in 1934; $122,352 in 1935; and $287,537 in 1936. There is no evidence as to the amount of dividends distributed to stockholders in 1935 and 1936, if any. There is no evidence as to the salaries paid in the taxable years to C. U. Yaeger and Rick Ricketson, who were also officers and stockholders, so that it is not possible to judge the value to petitioner of the services of the two officers in question by means of any comparison with the services rendered to petitioner by the other officers. Also, there is no evidence to show

what petitioner would have had to pay to get others to do what Clover Yaeger and Maizie Ricketson did. It also is a fact that the compensation paid to each person in question was almost twice as great for 1936 as for 1935, but there is no evidence to show that there was a commensurate increase in the services of each person or in the value thereof to petitioner to justify allowance of the increases as ordinary and necessary business expenses. While Maizie Ricketson had been engaged previously in newspaper work, there is no evidence as to the compensation paid to her by other employers for, perhaps, similar work. Further, there is no evidence to prove that the payments in question were not influenced by family considerations and were not disguised distributions of profits. *Botany Worsted Mills* v. *United States*, 278 U. S. 282. In short, aside from showing that each of the officers and stockholders in question rendered some services to petitioner in the taxable year, the petitioner has introduced only very meager evidence in support of its allegation that the services were reasonably worth, as ordinary and necessary business expense, the large sums deducted in the returns. The approval of the compensation paid in the taxable years by petitioner's board of directors is not conclusive of the reasonableness of the compensation for purposes of deduction as an ordinary and necessary business expense. *L. Schepp Co.*, 25 B. T. A. 419; *East St. Louis Finance Co.*, 34 B. T. A. 1085.

The amounts in question constituted high annual salaries. The total amount paid Clover Yaeger in 1935 represented an increase of $10,000 a year over the total amount paid to her in 1934; and the sum paid to her in 1936 represented an increase of $8,300 over the sum paid to her in 1935. But it appears that Clover Yaeger rendered greater services in 1935 and 1936 than she had done in 1934. It also appears that in July 1936 she discontinued some of the office work she had been doing in 1935. Maizie Ricketson's services in the taxable years do not appear to have been worthless, nor do they appear to have increased in 1936 over what they were in 1935. Upon due consideration of the evidence it is held that a reasonable allowance, under section 23 (a), for compensation for services performed by Clover Yaeger is $2,400 in 1935, and $1,800 in 1936; and, for services performed by Maizie Ricketson, $1,200 in each year. This has been found as a fact. See *L. Schepp Co., supra; Long Island Drug Co.*, 35 B. T. A. 328; affd., 111 Fed. (2d) 593; *Wagegro Corporation*, 38 B.T.A. 1225, 1229; *New York Talking Machine Co.*, 13 B.T.A. 154; cf. *Cohan* v. *Commissioner*, 39 Fed. (2d) 540, 544; *Frederick L. Watson*, 25 B.T.A. 971; *Atlas Plaster & Fuel Co.*, 18 B.T.A. 1123; affd., 55 Fed. (2d) 802.

*Issue 2—Was petitioner a personal holding company?*—The respondent determined that 80 percent of petitioner's net income for the taxable years was properly attributable to royalties as that term is used in section 351 of the Revenue Acts of 1934 and 1936,[1] and as defined in article 351-2 of Regulations 86 and 94.[2] Accordingly, respondent determined that petitioner was subject to surtax in 1934, 1935, and 1936, under section 351.

The question is whether or not petitioner is a personal holding company, subject to surtax, within the definition of section 351 (b). The answer to this question turns upon whether or not petitioner's income in 1934, 1935, and 1936 was derived from royalties.

The facts were stipulated and have been set forth at length in the findings of fact. Briefly, the nature of petitioner's business was to sell to theatre operators an idea and to provide them with a few simple articles to execute the idea, both for charges covered by contracts. The so-called system was a sales promotion or advertising plan, intended to increase patronage of moving picture theatres. From the beginning petitioner was aware of the difficulties involved. First, while petitioner hoped to obtain an exclusive right to its system by obtaining a patent, it knew in January of 1934, when a patent application was rejected, that it was extremely doubtful whether exclusive control over the use of the system could be obtained. Second, petitioner was fully aware of the possibility that the system could be attacked as a lottery. In spite of the apparent dangers, petitioner obtained many contracts from theatre owners, who paid petitioner a stated sum on a weekly basis for the use of the system. The contracts were in the form of licensing agreements, and this gives rise to respondent's claim that the income from the

---

[1] SEC. 351. SURTAX ON PERSONAL HOLDING COMPANIES.

* * * * * * *

(b) *Definitions.*—As used in this title—

(1) The term "personal holding company" means any corporation * * * if—(A) at least 80 per centum of its gross income for the taxable year is derived from royalties, dividends, interest, annuities, and (except in the case of regular dealers in stock or securities) gains from the sale of stock or securities, and (B) at any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.

[2] ART. 351-2. *Classification of a personal holding company.*—* * *

* * * * * * *

From the standpoint of the nature of the gross income, a corporation comes within the definition of a personal holding company for any taxable year when 80 per cent or more of its gross income for such taxable year was derived from the following sources:

(1) *Royalties.*—The term "royalties" includes amounts received for the use of or for the privilege of using patents, copyrights, secret processes and formulas, good will, trade marks, trade brands, franchises, and other like property. It does not include rents, nor over-riding royalties received by an operating company. As used in this paragraph the term "overriding royalties" means amounts received from a sublessee by the operating company which originally leased and developed the natural resource property in respect of which such overriding royalties are paid.

agreements constituted license fees or royalties. A license fee is, generally speaking, synonymous with royalty. See 48 C. J. 276, par. 447.

But petitioner had no property rights in its idea or system on which it could give licenses to others. The means of carrying on the system were not patentable. We should not and need not ignore judicial determinations relating to petitioner's business, such as the following decisions: *Affiliated Enterprises* v. *Gantz*, 86 Fed. (2d) 597, decided December 3, 1936, by the Circuit Court of Appeals for the Tenth Circuit; and *Affiliated Enterprises* v. *Gruber*, 86 Fed. (2d) 958, decided December 18, 1936, by the Circuit Court of Appeals for the First Circuit. In the *Gantz* case, petitioner sued to enjoin Gantz from using petitioner's system or one similar to it, upon a claim of ownership of a property right therein on the basis of copyrights held on the instruction sheets and a claim to trade-mark rights in the name "Bank Night" in the State of Oklahoma. In the *Gruber* case, petitioner sued to enjoin a competitor from using a similar system under the name of "Parlay Cash Night." Petitioner alleged ownership of property rights in its system on the same grounds as in the *Gantz* case, and petitioner alleged unfair competition. In deciding each case adversely to petitioner's claims, the respective courts held as follows: (1) That petitioner was not entitled to restrain others from the use of the system; that the use of the system could not be covered by copyright; that petitioner had no right at large in a trade-mark to constitute an exclusive right to use the system described by the name Bank Night; that the system was so closely akin to a lottery as to be not entitled to the protection of a court of equity; (2) that petitioner had no property right in the system, which, having been disclosed to the public could be copied along similar plans and used by others in the same way; that the system itself, being in no sense a writing, could not be copyrighted, and in fact was not copyrighted; that the use of a similar system by others did not constitute unfair competition; that petitioner had no property right in the system, although it had expended time and money in developing the system.

In the *Gruber* case the court said:

While the plaintiff restricts operating under the system to its licensee, by its very nature, in order for it to operate, knowledge thereof must be thrown open to the public and any property right based upon secrecy was lost as early, at least, as the first public exhibition, and there was no surreptitious appropriation of knowledge of the system by the defendants.

In the face of the above situation, it is the essence of respondent's position that petitioner actually did obtain income through license of its system to others under a purported ownership of a property right,

the use of which purportedly could be licensed; and that, therefore, the income received constituted royalities within the meaning of the definition prescribed in section 351 (b).

Petitioner contends that, in spite of the form of its contracts as license agreements, since payments were made on a weekly basis in a flat sum, regardless of use of the system, the income from the contracts was in the nature of rents and was not royalties. Petitioner argues that the wording of the statute "can not be extended by implication, and in case of doubt, construction must be against the government", citing *Commonwealth* v. *Philadelphia Rapid Transit Co.*, 134 Atl. 455.

The facts are that at least 80 percent of petitioner's income was derived from the so-called license agreements and more than 50 percent of its stock was owned in each taxable year by not more than five persons.

Upon due consideration of all the facts, we are of the opinion that petitioner was not a personal holding company within the statutory definition. Petitioner had no exclusive property rights in its system. In January of 1934 the first application for a patent was rejected. The copyrights covering instructions and descriptive material did not extend to, and could not extend to, covering the entire system so as to give petitioner exclusive rights in the use thereof. Petitioner's income was in reality, income from a sales-promotion scheme for which many believed it worth the payment of fee. They received certain services by way of receiving all materials assembled for use under written instructions, in addition to the idea of operating the system.

We said in *Kiesau Petroleum Corporation*, 42 B. T. A. 69, that "our first resort should be to the natural, ordinary and familiar meaning of the words used" in the statute in construing the terms of section 351 (b). In this case, we are of the opinion that the ordinary and familiar meaning of the term royalties does not extend to the sort of income which petitioner succeeded in obtaining under its bold contracts. Accordingly, it is held that respondent erred in determining that petitioner was subject to surtax under the provisions of section 351.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

DISNEY concurs only in the result.

MURDOCK, ARNOLD, and OPPER dissent.