Miller Manufacturing Company, Inc. v. Commissioner.
Miller Mfg. Co. v. Commissioner
Docket No. 2607.
United States Tax Court
1944 Tax Ct. Memo LEXIS 131; 3 T.C.M. (CCH) 888; T.C.M. (RIA) 44283; August 22, 1944
*131 R. E. Cabell, Esq., Mutual Bldg., Richmond, Va., and Robert J. Heberle, Esq., State-Planters Bank Bldg., Richmond, Va., for the petitioner. L. W. Creason, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: The petition herein was filed for the purpose of redetermining the following deficiencies: Declared Value
Excess
Excess Profits
Profits
Year
Income Tax
Tax
Tax
1940
$14,989.07
$ 9,431.98
$16,486.37
1941
12,184.74
10,132.78
44,510.34
The Commissioner, inter alia, adjusted the petitioner's net income for the calendar years 1940 and 1941, by adding thereto the sums of $69,800 and $94,000, respectively. The "Explanation of Adjustments," which is contained in the deficiency notice, reads as follows: Salaries and bonuses aggregating $110,600 ($138,100) paid to the officers of the corporation for the taxable year 1940 (1941) have been reduced to $40,800 ($44,100). The amount disallowed, $69,800 ($94,000), represents excessive compensation for services rendered. [1]
Certain other adjustments to the petitioner's net income for the taxable years 1940 and 1941 were made *132 by the Commissioner. They have not been assigned as error in the petition filed herein and are not in issue in these proceedings. The only question presented to this Court for determination is what is a reasonable allowance for salary or other compensation for the personal services actually rendered to the petitioner by each of the latter's four officers during 1940 and 1941. From evidence adduced, we make the following Findings of Fact Miller Manufacturing Company, Inc. (hereinafter sometimes referred to as the petitioner) is a corporation duly organized and existing under the laws of the State of Virginia, with its principal office in Richmond, Virginia. Its corporate income, declared value excess profits, and defense tax return (Form 1120) and its corporation excess profits tax return (Form 1121), for the calendar year 1940 were filed at the office of the collector of internal revenue at Richmond, Virginia, as were also its corporation income and declared value excess profits tax return (Form 1120) and its corporation excess profits tax return (Form 1121) for the calendar year 1941. During the taxable years the petitioner owned 1,736 out of 2,000 shares of the stock of Emporia *133 Mfg. Co. of Emporia, Virginia, which it had acquired in 1938. The record contains no further information in that regard. Petitioner's predecessor was the partnership of Miller and Miller, of which J. C. Miller owned the preponderant interest. Petitioner was organized on April 20, 1909; J. C. Miller was petitioner's president and owned a majority of its capital stock until his death in 1927. The following table contains a list of the stockholders of record in 1920, 1928, 1940, and 1941: 1920
1928
1940-1941
SHARES
%
SHARES
%
SHARES
%
T. B. Saunders
82
2.73 1/3
395     9.45
395     9.53
H. A. Taylor
100
3.33 1/3
394 2/10
9.43
394 2/10
9.51
H. S. Winston, Jr.
60
2.00    262 8/10
6.29
262 8/10
6.34
Geo. Wright, Jr.
40     .96
40    .96
Total
242
8.06 2/3
1,092     26.13
1,092     26.34
J. C. Miller
1,560
52.00    J. C. Miller Estate
1,714     41.01
514     12.40
Lucille N. Miller, Surv. Trustee
540    12.92
540     13.02
J. C. Miller, Jr.
400    9.65
Lewis N. Miller
400     9.65
Rebecca Miller Denny
400     9.65
H. S. Winston
730
24.33 1/3
H. S. Winston Estate
500     11.96
500     12.06
W. L. Clack
396
13.20    W. L. Clack Estate
210     5.02
210     5.05
A. G. Taylor
36
1.20    90 4/10
2.16
90 4/10
2.18
T. E. Davis
24
.80    33 6/10
.80
J. W. Keith
12
.40    Total Shares Outstanding
3,000
100.00    4,180     100.00
4,146 4/10
100.00
Treasury Stock
20     53 6/10
TOTAL SHARES ISSUED
3,000
4,200     4,200     *134 After the death of J. C. Miller in 1927, T. B. Saunders, H. A. Taylor, and J. C. Miller's widow, Lucille N. Miller, became the executors of the will of the decedent. The estate of J. C. Miller in 1928 consisted in part of 1,714 shares of stock in petitioner. Saunders and Taylor controlled the vote of this block of stock from 1928 through 1936. In 1937, 1,200 shares of this stock was distributed in equal shares to the children of J. C. Miller, namely, J. C. Miller, Jr., Lewis M. Miller, and Rebecca Miller Denny, none of whom were minors at that time, leaving only 514 shares of petitioner's stock in the estate of J. C. Miller, and in 1940 and 1941 Messrs. Saunders and Taylor voted these shares. The 540 shares of petitioner's stock owned by Lucille N. Miller in 1928, 1940, and 1941 were voted in 1940 and 1941 by Messrs. Saunders and Taylor, who handled practically all of her personal affairs during 1940 and 1941. The 210 shares owned by the estate of W. L. Clack in 1928, 1940, and 1941, were voted in 1940 and 1941 by H. A. Taylor. The 500 shares of petitioner's stock owned by the estate of H. S. Winston in 1928, 1940, and 1941 were controlled in 1940 and 1941 by the Merchants National *135 Bank and the decedent's widow as co-trustees. These 500 shares were not voted in 1940 or 1941 because the results of petitioner's operations were highly gratifying to the bank. The A. G. Taylor who is listed as owning 90 4/10 shares in 1928, 1940, and 1941 is not related to H. A. Taylor. In 1940, 2,756 shares out of a total of 4,146 4/10 shares outstanding were voted. [2] Of these, T. B. Saunders, H. A. Taylor, H. S. Winston, Jr., and Geo. Wright, Jr., controlled the vote of 2,356 shares. [3] In 1941, 3,156 shares out of a total of 4,146 4/10 shares outstanding were voted. [4] Of these, T. B. Saunders, H. A. Taylor, H. S. Winston, Jr., and Geo. Wright, Jr., controlled the vote of 2,356 shares, as in 1940. In 1928, Messrs. Saunders, Taylor, Winston, Jr., and Wright, Jr., controlled the vote of at least 3,016 shares [5] out of a total of 4,180 shares outstanding. Thus, in 1928, 1940 and 1941, Messrs. Saunders, Taylor, Winston, Jr., and Wright, Jr., who collectively constituted petitioner's officers and who were all subject to the contingent salary arrangement in effect in 1928, 1940, and 1941 (and in certain other years), controlled the vote of more than 50 per cent of petitioner's outstanding *136 capital stock. All four of these men were directors in 1940 and 1941, and all except G. Wright were directors in 1928. However, Messrs. Saunders and Taylor did not hold any permanent proxies from the Miller Estate or interests. Petitioner's business is divided into three main departments, millwork, wooden box manufacturing, and lumber *137 and mason's department (building supplies). It also manufactured furniture, but began to discontinue this in 1941. The net profit for the calendar years 1938, 1939, 1940, and 1941 from the operation of these three departments was as follows.. Furniture
Lumber and
Mill Dept.
Box Dept.
Dept.
Mason's Dept.
Total
1938
$ 8,368.83
$ 3,039.07 [6]
$13,663.14
$11,816.62
$ 30,809.52
1939
46,612.61
4,081.83
2,997.16
10,560.89
64,252.49
1940
96,343.09
31,554.99
10,758.87
16,967.88
155,624.83
1941
101,834.32
159,838.34
n6 12,736.96
4,240.60
253,176.30
The following table is a schedule of petitioner's net sales, cash dividends paid, net income before and after both taxes and officers' compensation, and of the officers' compensation from 1920 to 1941, inclusive SCHEDULE OF NET SALES, CASH DIVIDENDS PAID, AND NET INCOME BEFORE AND AFTER OFFICERS' COMPENSATION AND FEDERAL TAXES Years 1920 to 1941, Inclusive Net Income
Before Taxes
Cash
and Officers'
Officers'
Net
Dividends
Year
Net Sales
Compensation
Compensation
Income
Paid
1920
$1,354,089.79
$173,093.34
$ 69,481.84
$ 76,164.06
$50,000.00
1921
1,032,031.74
82,358.17
31,100.00
43,582.94
1922
1,182,060.00
133,281.72
40,000.00
81,621.50
1923
1,588,049.22
154,671.19
70,041.67
74,050.83
63,000.00
1924
1,532,063.31
120,204.73
52,102.19
59,539.72
42,000.00
1925
1,480,063.58
107,341.04
42,200.00
56,620.70
41,800.00
1926
1,437,018.95
73,869.41
30,800.00
37,201.04
1927
1,382,036.11
84,220.01
35,383.35
42,144.71
25,080.00
1928
1,406,952.80
92,678.41
30,800.00
54,393.00
33,440.00
1929
1,467,296.20
62,717.77
30,800.00
28,362.82
25,080.00
1930
1,031,852.63
11,866.11
26,510.00
[7] 14,643.89
1931
845,702.81
[7] 6,412.26
22,850.00
[7] 29,262.26
1932
611,246.42
27,317.29
17,429.95
9,887.34
1933
766,828.42
66,201.46
19,251.56
40,909.01
37,317.60
1934
670,411.63
46,087.29
20,314.00
22,051.68
20,732.00
1935
844,249.68
68,528.60
28,878.00
34,004.60
33,171.20
1936
1,037,599.92
86,158.75
29,780.00
46,834.31
33,171.20
1937
1,330,768.63
110,818.87
40,780.00
58,006.16
41,464.00
1938
1,119,844.54
66,344.51
30,600.00
29,413.31
20,732.00
1939
1,441,424.22
109,941.38
38,600.00
58,765.45
41,464.00
1940
1,913,812.98
269,908.91
110,600.00
99,571.23
41,464.00
1941
2,800,165.59
403,411.45
138,100.00
118,124.91
74,635.20
*138 Federal taxes for 1935 through 1941, inclusive, were as follows: 1935
$ 5,646.00
1936
9,544.44
1937
12,032.71
1938
6,331.20
1939
12,575.93
1940
59,737.68
1941
[1] 147,186.54
Total salaries (other than manufacturing costs, including costs of labor [2]) paid to employees (other than officers) for the calendar years 1938, 1939, 1940, and 1941 were $59,367.77, $68,075.06, $77,460.73, and $102,049.84, respectively. Petitioner employed on an average 369 employees in 1938, 405 in 1939, 435 in 1940, and 501 in 1941. Petitioner was the largest millwork concern in the State of Virginia and probably in the east, during 1940 and 1941. Petitioner's officers during the years 1920 to 1941, inclusive, were as follows: 1920-1924
1925-1927
1928-1941
President:
J. C. Miller
J. C. Miller
T. B. Saunders
Vice President:
H. S. Winston, (Sr.)
T. B. Saunders
Vice President:
H. A. Taylor
H. A. Taylor
Treasurer:
T. B. Saunders
G. Wright, Jr.
G. Wright, Jr.
Secretary:
H. A. Taylor
H. S. Winston, Jr.
H. S. Winston, Jr.
*139 No one of the above officers was related to each other, or to the Miller family, by blood or marriage. [3] Petitioner's Board of directors during 1940 and 1941 consisted of T. B. Saunders, H. A. Taylor, H. S. Winston, Jr., G. Wright, Jr., Lucille N. Miller, and J. C. Miller, Jr. From 1928 through 1939, petitioner's board of directors consisted of T. B. Saunders, H. A. Taylor, H. S. Winston, Jr., and Lucille N. Miller, the latter being the wife of J. C. Miller, who died in 1927. The following tables show the fixed and contingent compensation paid to T. B. Saunders, H. A. Taylor, H. S. Winston, Jr., and G. Wright, Jr., from 1920 to 1941, inclusive: ANALYSIS OF FIXED AND CONTINGENT COMPENSATION OF OFFICERS Years 1920 to 1941, Inclusive T. B.
Saunders
H. A. Taylor
Year
Fixed
Contingent
Total
Fixed
Contingent
Total
1920
$ 5,000.00
$15,509.47
$20,509.47
$ 4,000.00
$10,239.63
$14,239.63
1921
7,500.00
7,500.00
7,000.00
7,000.00
1922
9,500.00
9,500.00
9,000.00
9,000.00
1923
7,500.00
8,112.50
15,612.50
7,000.00
8,112.50
15,112.50
1924
7,500.00
4,834.14
12,334.14
7,000.00
4,834.14
11,834.14
1925
11,000.00
11,000.00
11,000.00
11,000.00
1926
11,000.00
11,000.00
11,000.00
11,000.00
1927
11,000.00
11,000.00
11,000.00
11,000.00
1928
11,000.00
11,000.00
11,000.00
11,000.00
1929
11,000.00
11,000.00
11,000.00
11,000.00
1930
9,075.00
9,075.00
9,075.00
9,075.00
1931
7,575.00
7,575.00
7,575.00
7,575.00
1932
5,708.31
5,708.31
5,708.11
5,708.31
1933
6,875.78
6,875.78
6,875.78
6,875.78
1934
7,260.00
7,260.00
7,260.00
7,260.00
1935
11,000.00
11,000.00
11,000.00
11,000.00
1936
11,000.00
11,000.00
11,000.00
11,000.00
1937
11,000.00
3,300.00
14,300.00
11,000.00
3,300.00
14,300.00
1938
11,000.00
11,000.00
11,000.00
11,000.00
1939
11,000.00
2,000.00
13,000.00
11,000.00
2,000.00
13,000.00
1940
11,000.00
24,000.00
35,000.00
11,000.00
24,000.00
35,000.00
1941
11,000.00
30,450.00
41,450.00
11,000.00
30,450.00
41,450.00
*140 H. S.
Winston, Jr.
Geo. Wright, Jr.
Year
Fixed
Contingent
Total
Fixed
Contingent
Total
1920
1921
1922
1923
1924
1925
$6,000.00
$ 6,000.00
$ 3,200.00
$ 3,200.00
1926
6,000.00
6,000.00
2,800.00
2,800.00
1927
6,000.00
6,000.00
2,800.00
2,800.00
1928
6,000.00
6,000.00
2,800.00
2,800.00
1929
6,000.00
6,000.00
2,800.00
2,800.00
1930
5,700.00
5,700.00
2,660.00
2,660.00
1931
5,250.00
5,250.00
2,450.00
2,450.00
1932
4,100.00
4,100.00
1,913.33
1,913.33
1933
3,750.00
3,750.00
1,750.00
1,750.00
1934
3,960.00
3,960.00
1,834.00
1,834.00
1935
4,800.00
4,800.00
2,078.00
2,078.00
1936
5,500.00
5,500.00
2,280.00
2,280.00
1937
6,000.00
$ 2,200.00
8,200.00
2,780.00
$ 1,200.00
3,980.00
1938
6,000.00
6,000.00
2,600.00
2,600.00
1939
6,000.00
2,500.00
8,500.00
2,600.00
1,500.00
4,100.00
1940
6,000.00
20,000.00
26,000.00
2,600.00
12,000.00
14,600.00
1941
7,500.00
26,250.00
33,750.00
3,600.00
17,850.00
21,450.00
From 1920 to 1935 or 1936, one of petitioner's competitors was Montague Manufacturing Co.; in 1935 or 1936, the latter was liquidated *141 by bankruptcy proceedings. From 1920 throughout 1940 and 1941, the firm of Sitterding, Carneal and Davis was also a competitor of petitioner; that concern is now in the process of liquidation. Four other competitors of petitioner, all of whom had been in business many years, including 1940 and 1941, were Richmond Lumber Co., Ruffin and Pane, R. C. Seiwers, and H. Beckstoffer. These competitors were engaged in the millwork line. [ * ] At the eleventh annual meeting of petitioner's board of directors [8] held on February 10, 1920, the following resolution was unanimously adopted: 'BE IT RESOLVED, that the compensation of the Officers for the year beginning January 1st, 1920, shall consist in part of a guaranteed drawing account, and in part of an interest in the earnings of the Company over and above a certain sum as follows: Drawing accounts: J. Clifford Miller
$ 5,000.00
W. L. Clack
12,500.00
H. S. Winston
12,500.00
T. B. Saunders
5,000.00
H. A. Taylor
4,000.00
H. S. Winston, Jr.
2,400.00
"In addition to the *142 drawing accounts above stated there shall be paid to H. S. Winston, T. B. Saunders, H. A. Taylor and H. S. Winston, Jr., as additional compensation for their services rendered during the year 1920, provided they shall remain in the employ of the Company until Dec. 31st, 1920, a sum equal to one-half of the net earnings of the Company over and above $52,000.00, before any Federal taxes are deducted, which sum, if any, shall be divided amongst these four parties as follows: H. S. Winston
33 1/3 per cent
T. B. Saunders
30 per cent
H. A. Taylor
20 per cent
H. S. Winston, Jr.
16 2/3 per cent." Petitioner's net profits (before Federal taxes) for 1920 was $103,611.50 and H. S. Winston, T. B. Saunders, and H. A. Taylor were paid contingent compensation in addition to their fixed salary in 1920. A similar resolution providing for fixed drawing accounts for J. C. Miller, H. S. Winston, T. B. Saunders, H. A. Taylor, and H. S. Winston, Jr., and for additional contingent compensation for the latter four was passed by petitioner's board of directors for the year 1921, on February 8, 1921. The resolution provided that petitioner's net earnings had to exceed $50,000 before any contingent *143 compensation would be payable. Petitioner's net profits (before Federal taxes) for 1921 were $51,258.17. However, no contingent compensation was paid for 1921. The resolution of the Board of directors, adopted on February 14, 1922, providing for the compensation of petitioner's officers for 1922 provided for fixed compensation only. No contingent compensation was provided as the board of directors did not anticipate that petitioner's net earnings would be large enough to warrant such a provision. However, the individual drawing accounts were increased. Petitioner's board of directors passed a resolution on February 13, 1923, providing for fixed drawing accounts of J. C. Miller, H. S. Winston, T. B. Saunders, H. A. Taylor and H. S. Winston, Jr., and for additional contingent compensation for all of these five men. The latter four men became entitled to additional contingent compensation if petitioner's net profits exceeded $50,000 and J. C. Miller participated in the additional contingent compensation if the net profits equalled $65,000. Petitioner's net profits (before Federal taxes) for 1923 were $84,629.52, and additional contingent compensation was paid for 1923 to J. C. Miller, *144 H. S. Winston. T. B. Saunders, and H. A. Taylor. In 1924, petitioner's net income before taxes was $68,102.54 and additional contingent compensation was paid to J. C. Miller. H. S. Winston. T. B. Saunders, and H. A. Taylor. At the annual meeting of petitioner's board of directors held on February 10, 1925, the fixed drawing accounts of the officers were established in the following amounts: J. C. Miller, President
$11,000
T. B. Saunders, Vice President
11,000
H. A. Taylor, Vice President
11,000
H. S. Winston, Jr., Secretary
6,000 In addition thereto, contingent compensation was provided for these four men in the event that petitioner's net profits exceeded $65,000. Petitioner's net profits (before Federal taxes) for 1925 were $65,141.04; however, no contingent compensation was paid. The 1925 salary arrangement remained in effect during 1926 and 1927. No contingent compensation was paid by petitioner during either of those years as petitioner's net profits (before Federal taxes) were $43,169.41 in 1926, and $48,836.66 in 1927. At the annual meeting of petitioner's board of directors held on February 14, 1928, a guaranteed drawing account was set up for T. B. Saunders *145 (president), H. A. Taylor (vice president), and H. S. Winston, Jr. (secretary), of $11,000 for each of the first two and $6,000 for the latter. Additional contingent compensation was provided for these three and for George Wright, Jr., based upon net profits over $65,000. The 1928 salary arrangement continued in general to be the pattern adopted by petitioner's board of directors for each successive year from 1929 to 1941, inclusive. For example, in 1935 and 1936 the compensation was "on such basis as determined by the officers, not exceeding however, the basis as provided for the year 1928." However, no additional contingent compensation was paid from 1928 to and including 1936, as petitioner's net income (before Federal taxes) never exceeded $65,000 during those years. From 1930 to 1934, both years inclusive, petitioner's officers, including T. B. Saunders, H. A. Taylor, and H. S. Winston, Jr., voluntarily reduced their salaries below the figures provided for in the basic resolution of February 14, 1928. In 1937, petitioner's net income (before Federal taxes) was $70,038.87 and additional contingent compensation was paid for 1937 to T. B. Saunders, H. A. Taylor, H. S. Winston, Jr., *146 and to George Wright, Jr. In 1938, the motion adopted by petitioner's board of directors with respect to officers' compensation omitted any reference to the 1928 standard and simply provided that "the compensation for the officers for the year 1938 shall be placed on such basis as determined by said officers." Saunders and Taylor each received $11,000 as fixed compensation during 1938. Petitioner's net income for 1938 (before Federal taxes) dropped to $35,744.51, and no additional contingent compensation was paid. In 1939, petitioner's net income (before Federal taxes) rose to $71,341.38, and additional contingent compensation was paid for 1939 to T. B. Saunders, H. A. Taylor, H. S. Winston, Jr., and George Wright, Jr. On February 13, 1940, the 31st annual meeting of petitioner's board of directors took place. Present at this meeting were: T. B. Saunders, H. A. Taylor, H. S. Winston, Jr., Lucille N. Miller, George Wright, Jr., and J. C. Miller, Jr., being all of the directors. The minutes of this meeting recite in part as follows: "On motion duly made and seconded it was ordered that the compensation of the officers for the year 1940 shall be the basis as provided for the year 1928." *147 The net profits (before Federal taxes) for 1940 were $159,308.91 and additional compensation was paid for 1940 to T. B. Saunders, H. A. Taylor, H. S. Winston, and George Wright, Jr., but only in the amounts of $24,000, $24,000, $20,000 and $12,000, respectively. The reduction was effected in accordance with a letter dated December 30, 1940, which T. B. Saunders, H. A. Taylor, H. S. Winston, Jr., and George Wright, Jr., wrote to petitioner's board of directors and in which they stated in part as follows: "* * * we are of the opinion that the reasonable additional compensation' authorized by the board of directors last February should be limited to $80,000 to be divided amongst the officers of the company in proportion as follows: T. B. Saunders
30%
H. A. Taylor
30%
H. S. Winston, Jr.
25%
George Wright, Jr.
15% and we are acting accordingly." The minutes of the 32nd annual meeting of petitioner's stockholders, also held on February 11, 1941, recite in part as follows: "On motion duly made and seconded, the compensation for the Officers for the year 1940 was reviewed and approved." This meeting was attended by Lewis N. Miller and J. C. Miller, Jr., in addition to Messrs. *148 Saunders, Taylor, Winston, Jr., and Wright, Jr. The 32nd annual meeting of the petitioner's board of directors took place on February 11, 1941, and was attended by all the directors, including Lucille N. Miller and J. C. Miller, Jr. The following motion appears in the minutes of that meeting: "On motion duly made and carried, the compensation for the Officers for the year 1941 shall be on the following per annum basis, payable monthly. T. B. Saunders
$11,000.00
H. A. Taylor
11,000.00
H. S. Winston, Jr.
7,500.00
Geo. Wright, Jr.
3,600.00 Additional compensation shall be the basis as provided for the year of 1928." Petitioner's net profit (before Federal taxes) was $263,311.45. Additional contingent compensation was paid for 1941 to T. B. Saunders, H. A. Taylor, H. S. Winston, Jr., and George Wright, Jr., in the amounts of $30,450, $30,450, $26,250 and $17,850, respectively. The deduction was effected in accordance with a letter dated December 31, 1941, which was written by the same four men to petitioner's board of directors and in which "reasonable additional compensation" was limited to $105,000 and the percentages of Saunders and Taylor were reduced to 29 per cent *149 each, while that of Winston, Jr., remained the same and that of Wright, Jr., was raised to 17 per cent. The salary arrangement for 1942 was the same as that for 1941. Net sales for 1942 were $3,334,468.12. These letters dated December 30, 1940, and December 31, 1941, were written because the officers did not want to embarrass the company by taking more than petitioner could afford in those years and because they wanted to be sure that what they drew as compensation was reasonable. T. B. Saunders has been employed continuously by petitioner and its predecessor, the partnership known as Miller & Miller, since May 1, 1904. He has been petitioner's president since 1927, and has been in charge of the box department since 1920. J. C. Miller, Sr., had retired from the active management of petitioner's affairs in 1915. Petitioner makes no stock boxes, all boxes being made to order. Sales are made directly to the manufacturer, whose product goes into the boxes. During 1940 and 1941 petitioner made many very complicated boxes which required great detail in their construction. Petitioner experienced industrial disorders beginning in 1940 which culminated in a strike of petitioner's truck drivers *150 and this caused some additional work for the officers, including T. B. Saunders. The installation of new electric power units in 1938 and 1939 and the motorization of the entire plant resulted in more economical operation and permitted a greater sale of waste products such as sawdust and kindling wood. T. B. Saunders was in charge of the sale of waste products which increased from $4,600 in 1939 to $6,977 in 1940, and to $10,399 in 1941. Petitioner does not have either a general superintendent or a sales manager for the box department; these duties are performed by T. B. Saunders. He was also president of the Virginia Manufacturer's Association for two years. Net sales in the box department for 1938, 1939, 1940 and 1941 were $207,171.59, $258,807.56, $367,902.83, and $815,749.64, respectively. The box department is operated as an independent business in itself. T. B. Saunders devoted only part of his time to petitioner's business during 1940 and 1941. H. A. Taylor has been employed continuously by petitioner and its predecessor since 1908. He has been an officer and director of petitioner since prior to 1917 and vice president since 1925. He is next to T. B. Saunders in responsibility *151 and has been purchasing agent for the company since approximately 1915. He purchases all the raw products used by petitioner in its business, principally lumber from all parts of the United States. The material he buys constitutes about two-thirds of the cost of petitioner's business, and these purchases increased considerably in 1940 and 1941. H. A. Taylor also is in charge of receiving the lumber, storing it and delivering it to the mill. He also supervises the retail sale of building supplies, the net sales of which in 1940 and 1941 amounted to $328,413.86 and $301,640.31, respectively. His duties during 1940 and 1941 increased in volume over previous years due to the need of purchasing larger quantities of particular kinds of lumber and to the scarcity of purchasing box lumber. He worked about two Saturdays and three Sundays a month during 1940 and 1941, as compared with about one and a half Saturdays and Sundays in 1938 and 1939. H. A. Taylor devoted only part of his time to petitioner's business during 1940 and 1941. H. S. Winston, Jr., has been in the continuous employ of petitioner since 1914. He has been an officer of petitioner since 1925, having been secretary since that *152 time until either 1940 or 1941, when he became vice president. He has been in charge of the manufacturing, selling, and delivery of the products made in the millwork department since 1925. These include such things as window frames, doors, baseboards, * carpet sills, cabinets, panel work, blinds, stair, stair-rails, and bannisters. H. S. Winston, Jr., performs the duties of a general superintendent and in addition hires and supervises the training of all labor other than common labor. He also determines whether a particular job would be profitable, and supervises the preparation of bids. If the petitioner is awarded the contract, H. S. Winston, Jr.'s duties include the supervision of the drafting of the detailed plans and the assignment of the work to the various divisions in the millwork department. The type of work done is not standardized; rather each job is made to specifications. No product can be made up in advance. Practically all of the products of the millwork department are shipped by truck. H. S. Winston, Jr., worked a great many more nights in 1940 and 1941 than in 1938 and 1939, and at times all night. The net sales for the millwork department for 1938, 1939, 1940 and *153 1941 amounted to $567,988.15, $777,505.13, $1,023,140.78 and $1,467,663.97, respectively. The millwork department employed an average of 250 employees. During 1940 and 1941, there was an average of 60 to 100 special millwork contracts running through the mill at one time. H. S. Winston, Jr., devoted only part of his time to petitioner's business during 1940 and 1941. T. B. Saunders and H. S. Winston, Jr., were jointly in charge of the furniture department. Petitioner began to manufacture novelty furniture in the early thirties. Net sales for 1938, 1939, 1940, and 1941 were $163,645.75, $165,892.73, $194,355.51, and $215,111.67, respectively. In 1941, petitioner began to discontinue the making of furniture because of the difficulties involved in obtaining materials and because of the increased volume of business in the box department. George Wright, Jr., has been employed continuously by petitioner since 1920. He became treasurer of the corporation in 1925 and a director in 1939. From 1920 to 1925 he was head bookkeeper. After 1925, when H. S. Winston, Sr., died, Wright, as treasurer, took charge of the collection and credit departments. The credit standing of petitioner in 1940 *154 and 1941 was excellent. In handling credits. Wright's duties required him to analyze the estimate submitted by the small contractor to determine whether the contractor, who often worked with very little capital, could complete the job on time, and whether there was a profit in the job. This involved frequent visits to the job and many conferences with the contractor. Wright had to familiarize himself with the mechanics' lien laws of the various states in which petitioner operated, as petitioner has no regular legal department. He also supervised the accounting department and during 1940 and 1941 he had charge of all disbursements which amounted to close to two million dollars in 1940 and over two and a half million dollars in 1941. He also arranged loans with the bank and handled all petitioner's insurance. He was in charge of making reports to the Federal Government under such acts as the Social Security Act, the Fair Labor Standards Act and in connection with petitioners "war" contracts, which constituted 20 per cent of its net sales in 1940 and 45 per cent of its net sales in 1941. (Petitioner had no "war" contracts prior to 1940.) He also was in charge of complying with regulations *155 concerning priorities. He was also in charge of office personnel and acted as office manager. He also acted as traffic manager, determining what shipments are to be made by rail and what by truck. During 1940 and 1941, he worked approximately two Sundays a month, whereas prior thereto he had practically no Sunday and holiday work. Petitioner's bad debts based upon net sales during 1940 and 1941 was less than.0025 per cent; in 1938, less than.004 per cent; in 1939, a little more than.004 per cent; and in 1942, about.0006 per cent. Wright, Jr., devoted only part of his time to petitioner's business during 1940 and 1941. Petitioner's four officers constituted its management which was highly efficient and competent. Deliveries were made on time without exception, including the period of the industrial disorders. Messrs. Saunders, Taylor, Winston, Jr., and Wright, Jr., performed the same kind of duties in 1940 and 1941 as they did from 1935 through 1939, but the volume of their duties was greater in 1940 and 1941 than in previous years. Petitioner maintained its accounting records and filed its tax returns for 1940 and 1941 on an accrual basis. The fixed salaries of the four officers *156 were credited to and drawn by them month by month. The additional contingent compensation was credited to each of their accounts at the end of the calendar year, and charged at that time in a lump sum to overhead expenses for that year. Payment to each of the officers was made on February 13th of the following year, i.e., for 1940, on February 13, 1941, and for 1941, on February 13, 1942. Petitioner deducted from its gross income in its tax returns for 1940 and 1941 the following total compensation paid to its four officers in 1940 and 1941: 1940
1941
T. B. Saunders
$ 35,000
$ 41,450
H. A. Taylor
35,000
41,450
H. S. Winston, Jr.
26,000
33,750
Geo. Wright, Jr.
14,600
21,450
Total
$110,600
$138,100
That for the calendar years 1940 and 1941 the petitioner's corporation income, declared value excess profits, and defense tax returns recite [in addition to "salaries and wages (not deducted elsewhere)" shown under deductions as item No. 16] as follows: "Manufacturing costs labor; direct and superintendence, $388,624.93 and $510,088.00. respectively" [ * ]. *157 Petitioner claims the right, under this section, to deduct the following amounts paid as compensation to its officers in computing its net income for the taxable years, 1940 and 1941: 1940
1941
Fixed
$ 11,000
$ 11,000
T. B. Saunders
Contingent
24,000
30,450
Total
$ 35,000
$ 41,450
Fixed
$ 11,000
$ 11,000
H. A. Taylor
Contingent
24,000
30,450
Total
$ 35,000
$ 41,450
Fixed
$ 6,000
$ 7,500
H. S. Winston, Jr.
Contingent
20,000
26,250
Total
$ 26,000
$ 33,750
Fixed
$ 2,600
$ 3,600
Geo. Wright, Jr
Contingent
12,000
17,850
Total
$ 14,600
$ 21,450
Grand Total
$110,600
$138,100
Respondent disallowed $69,800 for 1940 and $94,000 for 1941 as "excessive compensation," thus allowing petitioner to deduct as compensation to its officers in computing its net income for 1940 the sum of $40,800, and $44,100 for 1941. The Commissioner in the deficiency notice for each year merely disallowed a lump sum as "excessive compensation * * * paid to the officers of the corporation," and did not specify what reasonable compensation would be for each of petitioner's officers. The petitioner *158 argues that this does not entitle the determination to the usual presumption of correctness. We do not agree. L. Schepp Co., 25 B.T.A. 419, cited by the petitioner, does not so hold. Though the question is the reasonableness of compensation of each officer under that case, it does not follow that the determination here is entitled to no presumption of correctness. It refers to excessive compensation paid to officers and in our opinion places upon the petitioner the burden of showing reasonable the compensation of each. The petitioner alleges and the answer denies that certain compensation was paid to each of the officers named in the petition and that the amounts "constituted fair and reasonable compensation for services rendered." We leave the burden with the petitioner. The question, therefore, to be determined by this Court is, as previously stated, what is a reasonable allowance for salary or other compensation for the personal services actually rendered to petitioner by each of its four officers during 1940 and 1941. This is a question of fact and the determination thereof in any particular case must rest solely on the facts in that case. Capitol-Barg Dry Cleaning Co. v. Commissioner, 131 Fed. (2d) 712, 715. *159 The burden of proof, generally speaking, "is upon petitioner to establish the invalidity of the deficiency assessment.". Am-Plus Storage Battery Co. v. Commissioner, 35 Fed. (2d) 167, 168. If this Court finds that petitioner has failed to sustain that burden, such a finding is the equivalent of a finding that the amounts allowed by the Commissioner are reasonable, Crescent Bed Co., Inc., v. Commissioner, 133 Fed. (2d) 424. However, this Court may determine that an amount greater than that allowed by the Commissioner and less than that claimed by petitioner is a reasonable allowance for salaries or other compensation if the facts in the case under consideration justify such a conclusion. Affiliated Enterprises, Inc., 42 B.T.A. 390, reversed on other grounds, 123 Fed. (2d) 665; Wagegro Corporation, 38 B.T.A. 1225; Heywood Boot & Shoe Co. v. Commissioner, 76 Fed. (2d) 586, 587. Although this Court is not "required to ascertain such reasonable allowances with mathematical precision," H. Levine & Bros., Inc., v. Commissioner, 101 Fed. (2d) 391, *160 nevertheless the petitioner has the burden of establishing the facts upon which this Court can make its determination and any deficiency in such proof necessarily will have to be resolved against petitioner "whose inexactitude is of his own making." Cohan v. Commissioner, 39 Fed. (2d) 540 544; Wagegro Corporation, supra, page 1230. The court in the Crescent Bed Co. case, supra, page 425 of its opinion, recognized the consequences which flow from a failure of proof when it made the following statement: "Verdicts and other fact findings often rest on the failure of one having the burden of proof to carry it successfully." A careful analysis of the evidence in the instant case reveals certain deficiencies in petitioner's proof. These deficiencies in proof, together with other facts which affirmatively appear, convince this Court that the respondent's determination on this issue should not be disturbed. Thus the record contains the names of various frims which have been petitioner's competitors since 1920. One of these, Montague Manufacturing Co., was liquidated in 1935 or 1936 through bankruptcy proceedings. Petitioner's *161 evidence covers the salaries paid to its officers from 1920 to 1941, but the record is silent on the question of what salaries were paid by the Montague Manufacturing Co. at any time from 1920 to 1935 or 1936 to its executive heads. Another of petitioner's competitors, Sitterding, Carneal and Davis, although in the process of liquidation in 1944, operated throughout the taxable years here in question, but petitioner offered no proof of the salaries paid by Sitterding, Carneal and Davis to its officers. Other concerns such as Richmond Lumber Co., Ruffin and Pane, R. C. Seiwers, H. Beckstoffer, were shown to have been competitors of petitioner during 1940 and 1941; but the record is silent as to the salaries paid to the executive heads of these concerns. This silence is not without eloquence. The absence of such proof as this has been considered in sustaining the Commissioner's determination. L. & C. Mayers Co., Inc., v. Commissioner, 131 Fed. (2d) 309. In the Mayers case, the Circuit Court of Appeals for the Second Circuit said, in refusing to interfere with the Commissioner's reduction of corporate salaries as deductions: * * * But until it is *162 apparent that the allowance * exceeds any possibly reasonable limits, we should not intervene; at least not unless there is evidence of a current rate in closely similar businesses, such as practically is seldom, if ever, available. It is true that in the case at bar the taxpayer made an effort to prove what were the usual salaries in similar businesses but the testimony was not so compelling that the Tax Court was bound to accept it. *Reference is to the reduction made by the Commissioner. No such proof was ever offered in the instant case. We do not say that it is always indispensable, but we consider the lack of such proof here, where comparable competitors appear, as not to be overlooked. Nor do we think the evidence of J. L. Camp, Jr., who testified that in his opinion the total compensation paid by petitioner in 1940 and 1941 to each of its four officers was not unreasonable, supplies the proof necessary to sustain petitioner's contention. Nothing indicates that Camp's testimony would have been the same if he had been aware of the fact, clearly established by the evidence, that each of these four officers devoted only part of their time to the business of petitioner. Assuming, *163 without deciding the point, that $110,600 in 1940 and $138,100 in 1941 might represent in the aggregate a reasonable amount for salaries and other compensation to be paid by petitioner to its full-time officers and executive heads for those years, that is not the question to be decided by this Court, for the officers here involved did not, under the evidence, devote such full time to petitioner's affairs. Furthermore, in the Shield Company, Inc., 2 T.C. 763, 770, we stated that "the test of reasonableness is not to be applied to the aggregate salaries paid, but to the salary received by each individual. L. Schepp Co., 25 B.T.A. 419." In the absence of any evidence as to the percentage of time devoted by petitioner's officers to petitioner's business, the difficulty in applying the test of reasonableness is readily apparent. The record contains statements by these four officers as to work which they had to do on some Sundays, some Saturdays and at night during 1940 and 1941. But the fact that each of them devoted only part of his time to petitioner's business is established by two sworn statements made on behalf of petitioner *164 over the signatures of two of these same officers, one in the income tax return of petitioner for each of the two years here involved, and nowhere does the record, except by the references to such work at night and at times on Saturdays and Sundays, indicate any error in the two sworn statements. We are, therefore, left without knowledge as to what portion of their time the officers spent on petitioner's affairs. The record shows that petitioner owned 1,736 out of 2,000 shares of the stock of Emporia Mfg. Co. of Emporia, Virgina. Perhaps these officers devoted a part of their time to that company. The amount of time devoted to the business by an officer is directly and clearly important on this question. We obviously, under the facts here, though no doubt these officers were capable men, may not disregard the failure of proof as to the quantity of time devoted by them to the petitioner. This phase of the evidence distinguishes the instant case from William S. Gray & Co. v. United States, 35 Fed. (2d) 968, upon which petitioner relies, for in the Gray case, the officers devoted all of their time to the corporation's business. Petitioner also relies *165 upon Capitol-Barg Dry Cleaning Co. v. Commissioner, supra.In that case the court pointed out at page 715 that a resolution by the board of directors "created the inference that the salary allowances were reasonable * * *." But that inference does not preclude the Commissioner from determining whether, under the applicable revenue statutes, the salary allowances are in fact reasonable. See Botany Worsted Mills v. United States, 278 U.S. 282; H. L. Trimyer & Co., Inc., v. Noel, 28 Fed. (2d) 781. In Toledo Grain & Milling Co. v. Commissioner, 62 Fed. (2d) 171, cited in the Capitol-Barg Dry Cleaning Co. case, "the undisputed evidence bears out the inference that the salaries voted were reasonable * * *"; not so in the instant case. In Ox Fibre Brush Co. v. Blair, 32 Fed. (2d) 42, also cited in the Capitol-Barg Dry Cleaning Co. case, the court pointed out that the presumption created by the action of the board of directors is not conclusive. We are of the opinion that not only does the evidence in the instant case fail *166 to bear out the contention that the salaries voted were reasonable, but also that the presumption created by the action of the board of directors has been rebutted successfully. We note also that during 1940 and 1941 petitioner's board of directors consisted of six individuals, four of whom were the same officers whose salaries are in question here and also that during 1940 and 1941 these same four officers voted a majority of petitioner's outstanding capital stock. It is true that the method of fixing compensation followed by petitioner over a period of many years included a plan providing for contingent compensation based upon net profits in addition to fixed salaries or drawing accounts. We have considered the applicability of section 19.23 (a)-6 of Regulations 103, subsection (2) of which provides in part as follows: * * * Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though *167 in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. However, that which has been quoted above from section 19.23 (a)-6 (2) is limited in the scope of its application by subsection (3) of section 19.23 (a)-6, which provides in part as follows: In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like' enterprises under like circumstances. * * * Literal compliance with the terms of the resolutions passed by petitioner's board of directors on February 13, 1940, and on February 11, 1941, would not have met the requirements of section 19.23 (a)-6 (3), quoted above, as to reasonableness. Petitioner's officers recognized this and voluntarily on the last day of each of the taxable years here in question, 1940 and 1941, waived their rights under those resolutions. In other words they recognized that the resolutions were, as to those years, not reasonable. This in itself appears to contradict any inference from the resolution *168 that the compensation provided was reasonable, and in the decision of the question of the reasonableness of the compensation paid to petitioner's officers, we receive no substantial aid from the resolutions. However, even if, under the circumstances present in the instant case, we still regard the resolutions by petitioner's board of directors as creating the inference or presumption referred to in the Capitol-Barg Dry Cleaning Co. case, supra, nevertheless, we do not consider the inference or presumption of sufficient strength to entitle petitioner to revail on this issue. We may not regard as sufficient proof to sustain petitioner's contention the ratio of the aggregate salaries to net earnings or gross sales, L. Schepp Co., supra, pages 429 and 430, or the fact that in previous years petitioner paid its officers more than that which respondent is allowing for the taxable years in question in the instant case; the Shield Company, Inc., supra, page 770. However, in concluding that respondent's determination should be sustained, we have not overlooked such factors as the rising cost of living and the general *169 advancement of salaries which took place in 1940 and 1941. Nor have we disregarded the fact that in 1940 and 1941 the cash dividends paid by petitioner were $41,464 and $74,635.20 [1], respectively. The latter facts as to dividends are not persuasive when it is seen that the relation of dividends to net income before officers' salaries and taxes [2], expressed in terms of percentages, for 1935, 1936, 1937, 1938 and 1939, was 48 per cent, 39 per cent, 37 per cent, 31 per cent and 38 per cent, respectively, whereas the same relationship for 1940 and 1941 was only 15 per cent and 19 per cent, respectively, and that, whereas salaries paid to officers in 1940 and 1941 were almost twice as much as cash dividends paid in those years, dividends exceeded salaries in 1935, 1936, 1937, and 1939. If we consider dividends before officers' salaries and after Federal taxes, the percentages for 1935 to 1939 are, respectively, approximately 53 per cent, 43 per cent, 42 per cent, 35 per cent, and 43 per cent, and the percentages for 1940 and 1941 are 20 per cent and 29 per cent, respectively, but our conclusion is not essentially modified. Furthermore, we note that in 1938 and 1939 petitioner's expenses *170 in the nature of salaries and wages which did not enter into the manufacturing costs and which were paid to employees other than officers amounted to $59,367.77 and $68,075.06, respectively, whereas total compensation paid to officers (also not a manufacturing cost) during 1938 and 1939 was only $30,600 and $38,600, respectively. The significance of this fact is readily apparent when it is noted that in 1940 and 1941 petitioner's expenses in the nature of salaries and wages which do not enter into the cost of manufacturing amounted to $77,460.73 and $102,049.84, respectively, as compared with the much greater sums paid to petitioner's officers for 1940 and 1941, in the sums of $110,600 and $138,000, respectively. [3] *171 Footnotes
1. Figures for 1941 are in parentheses.↩
2. ↩
T. B. Saunders
395
H. A. Taylor
394 2/10
H. S. Winston, Jr.
262 8/10
Geo. Wright, Jr.
40
Lucille N. Miller, Tr.
540
Est. of W. L. Clack
210
Est. of J. C. Miller
514
J. C. Miller, Jr.
400
Total
2,756
3. ↩
T. B. Saunders
395
H. A. Taylor
394 2/10
H. S. Winston, Jr.
262 8/10
Geo. Wright, Jr.
40
Lucille N. Miller, Tr.
540
Est. of W. L. Clack
210
Est. of J. C. Miller
514
Total
2,356
4. ↩
T. B. Saunders
395
H. A. Taylor
394 2/10
H. S. Winston, Jr.
262 8/10
Geo. Wright, Jr.
40
Lucille N. Miller, Tr.
540
Est. of W. L. Clack
210
Est. of J. C. Miller
514
J. C. Miller, Jr.
400
Lewis M. Miller
400
Total
3,156
5. ↩
T. B. Saunders
395
H. A. Taylor
394 2/10
H. S. Winston, Jr.
262 8/10
Geo. Wright, Jr.
40
Est. of J. C. Miller
1,714
Est. of W. L. Clack
210
Total
3,016
6. Loss.↩
7. Loss.↩
1. This paragraph was added by Tax Court order dated Oct. 18, 1944.↩
2. This parenthetical phrase was added by Tax Court order dated Oct. 18, 1944.↩
3. This sentence was added by Tax Court order dated Oct. 18, 1944.↩
*. This sentence was added by Tax Court order dated Oct. 18, 1944.↩
8. J. C. Miller, H. S. Winston (Sr.), W. L. Clack, T. B. Saunders, and H. A. Taylor.↩
*. This sentence was added by Tax Court order dated Oct. 18, 1944. - CCH. Opinion Section 23 (a) (1) (A) of the Internal Revenue Code
As amended by Sec. 121 (a) and (d) of the Revenue Act of 1942.
[9] provides as follows: SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or business expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * * ↩
1. This figure was changed from $72,635.20 by Tax Court order dated Oct. 18, 1944. ↩
2. The words "before officers' salaries and taxes" were added by Tax Court order dated Oct. 18, 1944. ↩
3. The preceding three sentences were substituted for somewhat similar matter by Tax Court order dated Oct. 18, 1944. The Commissioner evidently took such factors as the rise in the cost of living and the general advancement of salaries in 1940 and 1941, and the increase in the volume of petitioner's business in 1940 and 1941 over previous years into consideration, when he allowed petitioner's officers sums in addition to the fixed compensation to which they were entitled. We use the word "evidently" advisedly because we do not know as a fact what circumstances induced respondent to conclude that petitioner's officers were entitled to compensation in excess of their fixed salaries. But, as pointed out under analogous circumstances by this Court in the Shield Company, Inc., supra, at page 769, "However, that may be, respondent's determination must be deemed prima facie correct and petitioner is charged with the burden of establishing that the salaries paid were reasonable compensation for the services performed by each officer * * *." Though this is not a case of compensation paid to holders of large percentages of outstanding stock, nevertheless, two of the officers in question controlled and voted large amounts of stock in the taxable years. That is, therefore, a fact bearing upon the reasonableness of salaries voted to such officers, though of no such significance as personal ownership of stock which would otherwise receive larger dividends. We do not minimize the fact that the officers are shown to have contributed much to the success of the petitioner; and we are fully conscious of the justice of according weight to the conclusion of the corporate management as to salaries to be paid. On the record before us, however, most particularly because of no proof of comparable compensation in comparable situations, and no proof of amount of time devoted (but on the contrary affirmative showing that not all was devoted to the petitioner), we may not, in our opinion, do other than approve the Commissioner's determination. The evidence is not such as to permit or justify any determination upon figures anywhere between those used by the two parties. We conclude and hold that petitioner has not overcome the presumption of correctness of the determination of deficiency. That determination is therefore sustained, and Decision will be entered for the respondent ↩