Hoffman Radio Corporation (Formerly Mission Bell Radio Mfg. Co., Inc.) v. Commissioner.
Hoffman Radio Corp. v. Commissioner
Docket No. 11683.
United States Tax Court
1948 Tax Ct. Memo LEXIS 148; 7 T.C.M. (CCH) 433; T.C.M. (RIA) 48128; June 29, 1948
John B. Milliken, Esq., 937 Munsey Bldg., Washington, D.C., and Harrison Harkins, Esq., for the petitioner. Earl C. Crouter, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves Federal income tax, declared value excess profits tax and excess profits tax deficiencies for 1943 in the amounts of $3,279.24, $1,334.34, and $51,331.77, respectively. The Commissioner allowed deductions as reasonable compensation for services rendered in the amount of $25,000 for H. L. Hoffman, petitioner's president and general manager, and $12,000 for W. S. Harmon, petitioner's vice-president and chief engineer, instead of $63,613.20 and $22,171.08, representing salaries and bonuses, as claimed on petitioner's tax return. The only *149 question presented to this Court for determination is what is a reasonable allowance for salary or other compensation for the personal services actually rendered to the petitioner by each of the officers above named. A stipulation of facts was filed. We adopt same by reference and find the facts therein set forth. Such part thereof as it is considered necessary to set forth is included with other facts found from evidence adduced in our Findings of Fact Petitioner, a California corporation, was incorporated on June 30, 1932, under the name of Mission Bell Radio Mfg. Co., Inc. In 1943, without otherwise altering the continuity of its corporate existence, its name was changed to Hoffman Radio Corporation. The tax returns for the year 1943 involved herein were filed with the collector of internal revenue for the sixth district of California. During the period from 1932 to 1942 petitioner was chiefly engaged in the business of manufacturing commercial radio receiving sets. A general order of the War Production Board, issued March 7, 1942, and effective April 23, 1942, restricted and finally prohibited the commercial manufacture of radio receivers and phonographs. During 1942 petitioner *150 was engaged in the business of manufacturing radio and electronic equipment. Its percentage of sales of commercial radios, sub-contracts on Government orders, and experimental, as compared with the total sales that year was 31.61 per cent, 65.24 per cent, and.15 per cent, respectively. Its 1943 sales chiefly related to Government contracts and orders (99.96 per cent). The remaining part was commercial sales (.04 per cent). From the date of incorporation to 1941, inclusive, petitioner's operation was as follows: It sustained net losses in 1932, 1933. 1939, 1940 and 1941; it realized net income in the years 1934 to 1938. Comparative profit and loss statements for the years 1940 through 1943 reflect the following: 1940
1941
1942
1943
Net Sales
$121,812.16
$29,763.82
$351,950.62
$1,787,850.14
Cost of Sales
99,677.60
30,930.30
259,365.15
1,354,803.95
Gross Profit on Sales
$ 22,134.56
($ 1,166.48
$ 92,585.47
$ 433,046.19
Other Income
839.81
3,769.74
1,448.57
Total Income
$ 22,974.37
$ 2,603.26
$ 94,034.04
$ 433,046.19
Expenses (other than compensation of
President and Vice President)
$ 24,665.87
$15,709.80
$ 31,712.28
$175,828.97
Net Income Before Compensation of
Officers and Before Federal Taxes
($ 1,691.50)
($13,106.54)
$ 62,321.76
$ 257,217.22
Compensation of President and Vice
President
$ 10,200.00
$ 2,364.00
$ 25,932.70
$ 85,784.28 *
Net Income Before Federal Taxes
($ 11,891.50)
($15,470.54)
$ 36,389.06
$ 171,432.94 *
Federal Income and Excess Profits
Taxes
None
None
$ 2,386.77
$ 123,759.67 *
Net Income After Taxes
($ 11,891.50)
($15,470.54)
$ 34,002.29
$ 47,673.27 *
Dividends Paid
None
None
None
None
*151 Comparative balance sheets for the years 1941 through 1943 reflect the following: January
December
December
December
ASSETS
1, 1941
31, 1941
31, 1942
31, 1943
Current Assets
Cash
$ 785.14
$ 3,140.41
$ 11,830.51
$ 62,628.22
U.S. Treasury Notes
50,000.00
Notes and Accounts Receivable
5,682.97
667.72
61,820.94
354,264.36
Inventories
13,930.60
9,128.53
52,618.16
242,061.96
Development Advance Receivable
84,502.61
$20,398.71
$12,936.66
$126,269.61
$793,457.15
Fixed Assets
Land, Buildings, and Machinery
$ 2,718.65
$ 2,456.65
$ 21,062.89
$ 84,434.59
Reserve for Depreciation
2,018.46
2,275.71
3,924.54
20,441.69
$ 700.19
$ 180.94
$ 17,138.35
$ 63,992.90
Other Assets
$20,274.74
$ 5,088.77
$ 4,213.99
$ 20,098.64
TOTAL ASSETS
$41,373.64
$18,206.37
$147,621.95
$877,548.69
LIABILITIES AND CAPITAL
Current Liabilities
Accounts Payable
$ 7,685.91
$13,064.26
$ 71,414.58
$ 97,122.60
Notes Payable
1,000.00
30,000.00
233,448.17
Accrued Expenses
1,199.27
1,254.83
9,317.80
151,935.40
Reserve for Federal Taxes
137,146.38 *
Reserve for Renegotiation
51,192.00
$ 8,885.18
$15,319.09
$110,732.38
$670,844.55
Deferred Liabilities
Mortgage Payable
$ 27,000.00
Reserve for Contract Guarantee
22,641.30
$ 49,641.30
Capital Accounts
Capital Stock -
Preferred
$ $ $ $ 72,500.00
Common
41,300.00
41,300.00
41,300.00
41,300.00
Surplus - Paid in
10,373.71
10,373.71
10,373.71
10,373.71
- Earned
(19,185.25)
(48,786.43)
(14,784.14)
32,889.13 $ *
$32,488.46
$ 2,887.28
$ 36,889.57
$157,062.84
TOTAL LIABILITIES AND CAPITAL
$41,373.64
$18,206.37
$147,621.95
$877,548.69
*152 H. L. Hoffman became interested in acquiring control of petitioner in July of 1941. He made a thorough investigation of its affairs and was conversant with its history, physical and financial situation, as well as its status and reputation in the radio manufacturing industry. In October or November of 1941, Hoffman interested G. Gifford Davidge and Walter D. Douglas in a plan to acquire stock and management control of petitioner. Davidge and Douglas were conversant with the history, physical and financial situation of the petitioner, and its status and reputation in the radio manufacturing industry. Both Davidge and Douglas were experienced in radio and electrical business. Douglas also had experience in the statistical and financial phases of the security investment business. Both Davidge and Douglas were men of means, each with a net worth of approximately $750,000. Hoffman was not and is not now related to Douglas or Davidge, nor was he acquainted with them when the parties commenced the negotiations which culminated in their acquisition of stock and management control of the petitioner. Hoffman, Davidge and Douglas reached an agreement, prior to the drafting and the execution *153 of the formal documents involved, concerning the terms and procedures for acquiring stock and management control of petitioner. The formal documents embodying and effectuating the agreements were drafted at one time by Davidge's attorney. In brief, the preliminary agreement was that Hoffman was to enter into contracts to purchase, on an installment basis, all of the stock of petitioner; Hoffman was to hold the stock interest so acquired as trustee for himself, Davidge and Douglas, and their respective beneficial stock interests were to be 50 per cent, 25 per cent and 25 per cent; each of the parties was to become a director and officer of petitioner; Hoffman was to be employed as general manager at a fixed salary to be later agreed upon, plus an incentive compensation in a monthly amount equal to 3 per cent of the monthly gross sales; Hoffman, Davidge and Douglas were to loan cash to the petitioner in the amounts of $2,000, $4,000 and $4,000, respectively, and the contributors of a majority in amount of the money advanced were to be entitled to determine what was to be done, or not done, in respect to the advances; and if at any time any two of the parties should determine that the *154 operations of the petitioner could not be continued successfully, Hoffman was to make no further payments under the stock purchase contracts and the trust relative to the stock interest was to terminate. Prior to December 1, 1941, petitioner's stockholders were as follows: H. G. Schmieter
110 shares
Franklyn & Helen E. Warner
193 shares
P. L. Fleming
110 shares
Under the provisions of separate written agreements of December 1, 1941, and December 4, 1941, Hoffman agreed to purchase all of the 413 shares of the petitioner's outstanding stock previously belonging to such former stockholders, for the total sum of $11,755, to be paid in installments. The agreement of December 1, 1941, between Hoffman and H. G. Schmieter, provided in part that pending the making of payments for the stock, within 36 months, Hoffman should be employed as general manager and should be paid 3 per cent of the gross sales of all merchandise sold by petitioner, as a partial consideration for such services. The agreement had a provision as to dividends, as follows: "Hoffman shall in any event, at all times when he is not in default under the terms and conditions of this agreement, be entitled *155 to receive, have and take all dividends which may be properly declared upon said stock; provided that in the event he is in default, his right to such dividends shall ipso facto cease and terminate." The agreement also provided that new certificates for the 110 shares of stock should be issued to Hoffman, then endorsed to Schmieter as collateral security for the payment. The agreement of December 4, 1941, between Hoffman and Franklyn and Helen E. Warner, similarly provided in part that pending the making of payments for the stock, within 36 months, Hoffman should be employed as general manager and should be paid 3 per cent of the gross sales for the preceding month, and in addition such an amount as may from time to time be agreed upon between Hoffman and the petitioner. The note which was a part of this agreement provided that the 193 shares of stock should be assigned, pledged and transferred to the Warners as security for the payment. The note also expressly reserved to Hoffman "all voting rights to the stock so assigned, pledged and transferred, and to all dividends paid thereon." The third agreement, dated December 4, 1941, was between Hoffman and P. L. Fleming, relating to *156 the purchase of 110 shares of the stock of petitioner by Hoffman and payment within 36 months. It contained the provision that Hoffman should be employed as general manager and should be paid 3 per cent of the gross sales for the preceding month, and in addition such an amount as may from time to time be agreed upon between Hoffman and the petitioner. It also contained a provision with respect to dividends as follows: "* * * Fleming further agrees, expressly for the benefit of said company as well as for the benefit of Hoffman, that he will not take any action to enforce his claim against said company for salary earned and unpaid prior to January 15, 1943, and that on January 15, 1943, he will agree to a further extension of the time of payment of such claim unless on or prior to January 15, 1943, said company is in a position to pay dividends on its stock aggregating the sum of Fifteen Hundred Dollars ($1500.00), it being expressly agreed that, for the purpose of determining whether or not said company is in a position to pay such dividends, salaries paid to officers and/or employees of said company who during said year have been stockholders of said company shall be taken to aggregate *157 not more than Twelve Thousand Dollars ($12,000.00)." The note which was a part of this agreement provided that the 110 shares of stock should be assigned, pledged and transferred to Fleming as security for the payment. The note also expressly reserved to Hoffman "all voting rights to the stock so assigned, pledged and transferred, and to all dividends paid thereon." After Hoffman acquired the stock from Schmieter, he became a director of petitioner. At a director's meeting on December 4, 1941, the directors being Hoffman, Fleming and one M. E. Penney, Hoffman was employed as general manager of petitioner. The terms of the agreement were set forth in an instrument dated December 4, 1921. The agreement provided, in general, for payment to Hoffman of 3 per cent of all gross sales for each preceding month, as partial payment for his services as general manager. Additional compensation was to be "such other amounts as may hereafter from time to time be mutually agreed upon." The agreement was for 36 months, but terminable by Hoffman after February 28, 1942. After the approval of Hoffman's employment contract as general manager, Hoffman advised the Board that he had negotiations pending *158 to acquire the remaining outstanding stock of the petitioner and thereupon requested the Board to adjourn and recess for 30 minutes, which request was granted. During the recess Hoffman consummated the transactions to acquire the remaining outstanding stock of petitioner. The meeting of the Board reconvened and upon proper motions, duly made, Davidge and Douglas were substituted as directors in the place of Fleming and Penney. On December 9, 1941, Hoffman, Davidge and Douglas executed a contract setting forth the agreement of the parties to advance monies to the petitioner ($2,000 from Hoffman and $4,000 from each of the others); that such parties shall be directors of petitioner; that Hoffman shall be president and general manager and receive 3 per cent of the gross sales as part compensation for services; that Davidge shall be vice president, and that Douglas shall be secretary and treasurer. The contract also provided that all rights which Hoffman had in the stock, above mentioned, should be "held by him in trust for the benefit of himself, Davidge and Douglas * * *." The contract further provided that when and if Hoffman became owner of the stock, 50 per cent should belong to *159 him, 25 per cent should belong to Davidge, and 25 per cent should belong to Douglas. When Hoffman, Davidge and Douglas acquired their interests in the petitioner, as stated above, the main asset of the corporation was a license from the Radio Corporation of America, and one of the stipulations of the license was that it could not be sold or transferred. Consequently, it was necessary to rehabilitate the old company. Petitioner, early in 1942, employed Walter S. Harmon, on a basis shown by letter of March 10, 1942, as follows: "Confirming our conversation and verbal agreement in January, this letter is to confirm our arrangement at that time. Mission Bell Radio Mfg. Co., Inc., will pay you a salary of Seventy-five Dollars ($75.00) per week. "In addition to the above, we will pay you an override of one per cent (1%) on the gross volume of business done by the Company after excise tax and other applicable taxes are deducted. "Payment of this bonus will be made annually and semi-annually if agreeable to both parties. "This arrangement will be applicable to the year 1942 and renewable upon the consent of both parties." Later he was made vice-president. Petitioner, by action *160 of a majority of the board of directors (Hoffman and Douglas), on May 14, 1942, approved the above-mentioned salary and bonus arrangement with Harmon. Minutes of this date also refer to business and authorize salaries as follows: "It was brought before the Board of Directors by Mr. Hoffman that contracts on hand with Bendix Aviation, Ltd. amounted to approximately $300,000 and that prospects for future military work seemed to be promising. It was also pointed out that our present quarters were not adequate for the volume and type of work that we are doing, and they also do not meet the requirements of the Signal Corps. * * *
"Salaries for executives of the Company were discussed. It was pointed out by Mr. Hoffman that it would be necessary to terminate his connection with Peerless Electrical Products Company because of his duties at Mission Bell Radio Mfg. Co., and thereby eliminate this source of income. To compensate for this, motion was duly made, seconded and carried that his salary would be set at $800.00 per month. "Motion was made by Mr. Hoffman that the salary of Mr. Walter D. Douglas be set up on the books at $350.00 per month. Motion was duly seconded and carried. *161 " On December 16, 1942, petitioner and Harmon renewed the arrangement of March 10, 1942, with respect to "salary and override commission of one per cent" for the year 1943. On December 4, 1941, when Hoffman became general manager of petitioner, its physical plant and equipment were small and obsolete. It had no productive staff and its employees consisted of its then president, an office girl and a stock boy. The growth of petitioner's employee organization was as follows: Highest Number of
Year
Employees
1941
3
1942
107
1943
297
1944
351
In terms of plant expansion, petitioner progressed from its 1941 rented quarters encompassing 7,500 square feet, to a plant area of 15,000 square feet in 1942, and 40,000 square feet in 1943, including a one-story brick building encompassing 18,500 square feet, which was purchased by petitioner for approximately $55,000. (The $25,000 down payment was made from funds contributed by Hoffman, Davidge and Douglas.) Salary and bonus payments and stock ownership of three of petitioner's officers, were as follows: Salary and Bonus
Percentage of
Name and Office
1942
1943
Stock Owned
H. L. Hoffman, President and General Manager
$18,688.52
$63.613.20
50%
R. A. Yarcho, Secretary
2,483.25
5,762.26
None
Walter S. Harmon, Vice President and Engineer
7,244.18
22,171.08
none
*162 Petitioner was located in a number one labor area which made it difficult to obtain contracts from the Army and Navy. Hoffman was instrumental in getting various people together, both in the Los Angeles and San Francisco areas, to form an association called West Coast Electronic Manufacturers Association, of which he was elected president. The association contributed substantially in helping the smaller companies to secure war contracts. On recommendation of the Navy in 1943, petitioner was awarded the Army-Navy E award in 1944. Under date of September 8, 1943, petitioner negotiated for a bank loan from the California Bank of Los Angeles. Among other provisions the agreement contained one prohibiting the payment of dividends by petitioner without the prior written consent of the bank. Petitioner paid no dividends in 1943. Hoffman was 38 years of age in 1943. He received a degree of Bachelor of Arts from Albion College, Michigan, in 1928, with a major in both business administration and philosophy. From 1928 through 1941, his compensation for services rendered other business firms was substantially as follows: 1928
Sparton Radio $60 and $75 a week
1929
Reynolds Spring Co. Football coach
1929
Ellis Bishop Co. $100 month plus addition
1929
Broadway Department Store $125 month
1930 to
1935
Firestone Company $130 to $300 month
1936
Firestone Store $275 or $280 month
1937
Electrical Distributing Co. $275 month
1938
In business for self
1939
Sales Agent for Mfg. representative business
$1,900 year
1940
Lumber Mfg. Co.
$4,700 year
1941
Peerless Electrical Manufacturing Co. (paying own
expenses)
$13,000 year
*163 During this period he gained experience in practical factory and machine work and methods; supervision of factory production and personnel, merchandising, developing distributor organizations, sales programs and service organizations; training factory and sales personnel; coordinating sales programs and factory schedules, and salesmanship. Part of his experience was in the line of electrical products, including radios and fluorescent lighting. Hoffman was the only salesman and business solicitor employed by petitioner in the years 1942 and 1943. He obtained war contract orders in the amount of $4,382,050.13 in 1942 and in the amount of $881,244.81 in 1943. Production and delivery under the orders obtained in any one year was not necessarily limited to the year in which the order was obtained. The war contract orders, above mentioned, were of the fixed price competitive bid type. Hoffman was also in charge of personnel. He observed a 14 to 16 hour day. Petitioner did not have a Washington, D.C. representative in 1942 and 1943. The type of war contracts obtained and performed by the petitioner in 1942 and 1943 required the exercise of managerial, engineering, and mechanical skill *164 and inventiveness in design, production, procedures, tooling, testing equipment, and the efficient use of, or substitution for, materials which were critically short in supply; and many of the orders were of a type not solicited by comparable companies, or orders in the performance of which other companies had failed. The major war products produced by petitioner in 1942 and 1943 were frequency meters, variable condensers, antenna kites, phantom antennas, noice peak limiter and electronic relays, and electronic firing error indicators. Harmon was 39 years of age in 1943. His compensation for services rendered other firms in years prior to 1942, were substantially as follows: 1926
Music Master Corp.
$ 35 wk.
1927
Distanttone Radios
40 - 50 wk.
1928
Dayfon Electric Co.
35 - 55 wk.
1932
Zenith Radio Corp.
60 - 65 wk.
1933
Utah Radio Products
65 wk.
1934
Emerson Radio & Phonograph Corp.
75 wk.
1936
Mission Bell Radio Mfg. Co.
50 wk. plus 10" each set sold
1940
Mitchell-Hughes Co.
100 wk. (plus agreement for
1941
50% of net profits,
never received). During this period he gained experience in the fields of radio engineering, design and *165 development in both the automobile and household radio fields. While with Zenith Radio Corporation he developed the first practical single unit automobile radio made. While employed with petitioner, 1942 and 1943, he devoted his entire time to his engineering duties, working 16 hours a day, six days a week and sometimes part time on Sunday. He was also in charge of inspection. He spent some time visiting and conferring with other engineers in different sections of the United States. The Continental Radio and Television Corporation, which was succeeded by the Admiral Corporation, was engaged in the business of radio manufacture at Chicago, Illinois. In 1942 it had total net sales of about $7,500,000, and in 1943 it had total net sales of about $14,149,513. It had a net profit, after paying salaries and before payment of taxes, for 1943, in the amount of $1,098,633. All of its 1943 business was from Government orders. The salaries of its officers remained the same in 1943 as they were in 1942, for which years they were substantially as follows: President, $50,000; Vice President, $35,000; Vice President, $30,000; Treasurer, $18,000; Assistant Treasurer, $12,000; Secretary, $15,000; *166 Assistant Secretary, $12,000; and Washington representative, $8,600. Previous to 1942, it had been the habit of this corporation to increase salaries when it had a successful year. But no increase was permitted at this period, "according to law." Gilfillan Bros., Inc., was incorporated in 1917, and was in active business in and around Los Angeles. It had been in the business of manufacturing household radios since 1922. It also manufactured electronic equipment, radar and aircraft mechanical parts. In 1941 an estimated 75 per cent of its business was military work and 25 per cent related to commercial radios. At the beginning of 1942 it was manufacturing radios and aircraft precision parts. For the fiscal year ended May 31, 1943, it had net sales after renegotiation, in the amount of $3,495,822.57. It had a net profit, after renegotiation and before payment of taxes, in the amount of $306,949.64. The salaries of its officers for this period were as follows: President, $32,432.40; Vice President, $14,999.92; Vice President, $14,999.92; J. G. Gilfillan [office undesignated] $10,500; Vice President, $8,400.08; Secretary-Treasurer, $4,252.22. All of these officers except the Vice *167 President, whose salary was $8,400.08, were stockholders. The salary of the president had remained the same for a period of 15 or 20 years. The salary of its engineers for this period were as follows: Chief engineer, $15,000; Assistant Engineer, $12,000; Engineer, $10,000. Its total number of employees increased in 1943 from 750 to 1,000 at the end of the year. The officers' salaries of Gilfillan Bros., Inc., were "frozen during the war years." Reasonable compensation for services performed by Hoffman as president and general manager of petitioner for the year 1943 was $40,000. Reasonable compensation for services performed by Harmon as vice-president and chief engineer of petitioner for the year 1943 was $22,171.08. Opinion Section 23 (a) (1) (A) of the Internal Revenue Code provides as follows: "SEC. 23 DEDUCTIONS FROM GROSS INCOME. "In computing net income there shall be allowed as deductions: "(a) Expenses. - "(1) Trade or business expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation *168 for personal services actually rendered; * * *" Petitioner claims the right, under this section, to deduct the following amounts paid as compensation to its officers in computing its net income for the taxable year 1943: Name
Position
Amount paid
H. L. Hoffman
President & General Manager
$63,613.20
W. S. Harmon
Vice-Pres. & Chief Engineer
22,171.08
Respondent disallowed $38,613.20 as to Hoffman's salary and $10,171.08 as to Harmon's salary as "excessive compensation," thus allowing petitioner to deduct as compensation for its president and vice-president in computing its net income for 1943 the sums of $25,000 and $12,000, respectively. The question, therefore, to be determined by this Court is, as previously stated, what is a reasonable allowance for salary or other compensation for the personal services actually rendered to petitioner by each of the above-mentioned officers during 1943. "It is well settled that the question of what constitutes, for the tax deduction here in issue, reasonable compensation to a specific officer of a corporation, is essentially a question of fact to be determined by the peculiar facts and circumstances in each particular *169 case." Miller Mfg. Co. v. Commissioner, 149 Fed. (2d) 421, 422. See also Capitol-Barg Dry Cleaning Co. v. Commissioner, 131 Fed. (2d) 712. Petitioner strongly urges that this case should be decided on the basis of regulations promulgated by the Commissioner wherein the rule is stated in Regulations 111, section 29.23(a)-6 (2) and (3) as follows: "(2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract is may prove to be greater than the amount which would *170 ordinarily be paid. "(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned." Though the regulation might be considered none too clear, it is clear that the statute is of paramount weight and it requires reasonableness in salaries, so that the regulation must be understood as applying that test, even though there is contingent contract, also to be considered. The language of the regulation as to contract is limited by the language, consistent with statute, as to reasonableness. We have here considered both elements. The Internal Revenue Code provides that the salary or other compensation paid or incurred in carrying on any trade or business must be reasonable. The regulations above quoted do not alter the plain meaning of the Code. There is no part of the *171 regulation that provides, specifically, that any form of contingent compensation is exempt from the test specified in the Code, i.e., that it must be reasonable. On the contrary, the regulations provide that "any form of contingent compensation invites scrutiny" (italics added), further, "Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid." (Italics added.) Neither of these statements establishes the rule that a contingent contract for compensation, fair and equitable when made, is always to be considered binding at a later date and thereby exempt the corporation from showing the amount paid was reasonable. The statement that any form of contingent compensation invites scrutiny is an indication that this section of the regulation does not exempt a salary from being *172 reasonable. The sentence beginning with the words "Generally speaking" does not establish the rule as contended by petitioner, for the words themselves indicate that other requirements may be imposed. Section 29.23(a)-6 (3) provides that "In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances." The remaining portion of the section does not alter the conclusion that the amount paid must be reasonable. Austin et al. v. United States, 28 Fed. (2d) 677, relied on by the petitioner, though stating generally that it is immaterial that the actual working out of a contract may prove greater than the amount ordinarily paid, concludes that "under the peculiar facts" in that case, the contract was reasonable. The corporation, at the time of contract, was financially unable to continue in business and practically gave it up. In William S. Gray & Co. v. United States, 35 Fed. (2d) 968, some of the parties involved were not stockholders, there had for some years been a settled policy of compensation on a contingent basis, and the corporate earnings did not depend upon subordinates. The business, the court said, *173 was unique, and the policy of paying on a contingency of earnings was a part of the business, necessary for its success. The salaries were found to be reasonable. Other cases cited are not found helpful. Turning now to the question of what is reasonable compensation for each of the two officers here under consideration. The burden of proof, generally speaking, "is upon petitioner to establish the invalidity of the deficiency assessment." Am-plus Storage Battery Co. v. Commissioner, 35 Fed. (2d) 167. However, this Court may determine that an amount greater than that allowed by the Commissioner and less than that claimed by petitioner is a reasonable allowance for salaries or other compensation if the facts in the case justify such a conclusion. Affiliated Enterprises, Inc., 42 B.T.A. 390, reversed on other grounds, 123 Fed. (2d) 665; Wagegro Corporation, 38 B.T.A. 1225; Heywood Boot & Shoe Co. v. Commissioner, 76 Fed. (2d) 586. In the light of the overall picture of the case before us, we cannot say that petitioner has established that the $63,613.20, representing salary and bonuses, paid to Hoffman was a reasonable *174 allowance for ordinary and necessary expense for carrying on the business. We are not satisfied that the contract of employment, dated December 4, 1941, was the result of a "free bargain" between petitioner and Hoffman to secure his services, within the intendment of the regulation. Hoffman, at the time he contracted with the petitioner corporation itself, for the contingent salary here involved, was the owner of 110 of the 413 shares of stock, and a director, and had a contract for the purchase of the remainder of the stock. Also, he had a contract with the other individual stockholders, the Warners and Fleming (as with Schmieter from whom he had acquired the 110 shares), that he be made general manager on a basis of 3 per cent of gross sales. The contract for purchase of the Warner and Fleming stock was consummated on December 4, 1941, immediately after Hoffman's employment as general manager. All of this means to us that there was not in this matter the free bargaining and arm's length transaction, between a corporation and a proposed employee for services on a contingent basis, with which, under the regulation, there should not be interference. At the time of the signing of the *175 contract of employment between petitioner and Hoffman December 4, 1941, there is no indication but what the parties thought that the business would continue the manufacture of radios as in the past. We realize that petitioner's business activities were in poor condition at the time Hoffman closed the negotiations for acquiring stock and management control of it and that a great part of the success of the venture was due to his efforts. Conditions of the business had changed radically by the taxable year, here in question. In 1943 petitioner did an unusually large amount of business, attributable in the main, not to services rendered by Hoffman but to war conditions of the year. There is no indication that his services that year were of any greater value than the year before when he received a subtantially smaller salary and bonus. In fact, the contrary may be true since he obtained war contract orders in the amount of $4,382,050.13 in 1942 and in the amount of only $881,244.81 in 1943. We cannot attribute the importance to Hoffman's services that is urged by petitioner. Under all the circumstances and facts, we have concluded that $40,000 is reasonable compensation for Hoffman for *176 the year 1943. The contract of employment between petitioner and Harmon is on a different basis. We think it of much importance that Harmon owned no stock of petitioner, in fact had no interest in the corporation other than that interest in the corporation other than that of an employee. There was, therefore, "free bargain" between him and the petitioner for his services. The fact that he was later made an officer does not, in our opinion, change that relationship. At the time of the confirmation of his contract by petitioner's board of directors, May 14, 1942, this country was already in war and petitioner had already secured contracts for a large amount of business and it must have been apparent that a "first class engineer" would be needed. Harmon's testimony, at the hearing, impressed us. He was largely the "brains" behind the production end of the business and, therefore, was entitled to a substantial salary for his services. Since Harmon had charge of production and production was much greater in 1943 than in 1942, it is reasonable to assume that the amount of work and responsibility would also be increased in the latter year. We have some evidence of payments to engineers *177 in the amount of $15,000 but no comparison of the duties, responsibilities, or hours required to work. On the other hand, Harmon worked long hours and had the responsibility of the engineering department. Considering all the evidence, we have concluded that respondent erred in disallowing part of the salary and bonus paid to Harmon, and that the total amount paid (i.e., $22,171.08) should be allowed as reasonable salary or other compensation for personal services actually rendered. Decision will be entered under Rule 50. Footnotes
*. Computation does not reflect the adjustment and tax deficiency on the deduction disallowance at issue herein.↩