Millspaugh Building Corporation v. Commissioner.
Millspaugh Bldg. Corp. v. Commissioner
Docket Nos. 20067, 21789.
United States Tax Court
1950 Tax Ct. Memo LEXIS 20; 9 T.C.M. (CCH) 1151; T.C.M. (RIA) 50313; December 8, 1950
Francis C. Leffler, Esq., 40 Wall St., New York 5, N. Y. for the petitioner. Pershing W. Burgard, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: This proceeding involves deficiencies in income tax for the taxable years ended December 31, 1944 and 1945, in the respective amounts of $1,084.45 and $1,384.66. The issue presented is whether or not respondent erred in disallowing as deductions in 1944 and 1945 amounts of $4,188 and $4,000, respectively, of total annual compensation of $6,200 in each year paid to an officer of petitioner corporation, as in excess of reasonable compensation for personal services rendered. A second issue, whether respondent erred in including as additional income a credit to surplus of $1,292.15 as constituting *21 an insurance refund, was disposed of by a stipulation at the hearing. These consolidated cases were presented on a partial stipulation of facts, oral, and documentary evidence. [The Facts] The petitioner, a corporation organized under the laws of New York, is located in Middletown, New York. It filed its income tax returns for 1944 and 1945 with the collector of internal revenue at Albany, New York. In 1919, Stanley Millspaugh organized and incorporated petitioner corporation to acquire and operate real property in Middletown. He was in charge of its affairs until his death on February 23, 1943, when he was succeeded by Eudora Millspaugh, his wife, who then became petitioner's president and treasurer, which positions she held during the taxable years involved. Prior to this date, in 1939 or 1940, she had been elected a vice president and director. She continued as a director of petitioner during 1944 and 1945. Stanley, in 1919, also organized the Tompkins Drv Goods Company, Inc., (hereinafter called Tompkins), in Middletown. After his death Eudora also succeeded him as president and treasurer of this company. During Stanley's life, Eudora had discussed business problems *22 with him and in his will Stanley expressed a desire that his wife become directly interested in the management of his companies and that she be paid a reasonable salary. Petitioner's outstanding capital stock of some 643 shares was divided during the years in question as follows: Eudora owned 267 shares in her own name; Eudora and John Sammis, as co-trustees under Stanley's will, 375 shares; and W. J. Seeley, petitioner's vice president, one share. Sammis, a bank president in Middletown, had been a business associate of Stanley since 1933. The income from petitioner's stock held by Eudora and Sammis as trustees under Stanley's will was to be paid to Eudora, except that one-tenth of the income was to be paid to each of the five Millspaugh children when they reached 21. The children also had a remainder interest in the principal upon Eudora's death. Stanley in like manner bequeathed his interest in Tompkins in trust to Eudora and Sammis. This consisted of 609 of the 813 outstanding shares. Since 1919 petitioner continuously owned three pieces of property forming a contiguous tract in Middletown. It owned the department store building occupied by Tompkins, a double store building *23 occupied by a dry cleaner, and a parking lot adjacent to both buildings. The petitioner also purchased land for $1,000 in 1944. The property occupied by Tompkins and the parking lot are encumbered by mortgages. Petitioner received rent from its properties in the amounts of about $21,120 and $20,957 in 1944 and 1945, respectively. The principal source of petitioner's income during the years involved was the $18,000 annual rental paid to petitioner by Tompkins. The rental of the parking lot was $270 per annum and the balance of the rental income was received from the other stores. Total earnings and dividends from 1936 to 1945 were: Year
Total Income
Dividends Paid
1936
$22,339.23
$5,746.13
1937
22,189.04
1,030.60
1938
21,384.44
1,247.84
1939
21,065.43
1940
21,206.20
1941
19,854.52
988.20
1942
20,465.16
1,607.47
1943
20,754.99
1,172.20
1944
21,120.00
1,647.50
1945
20,957.50
1,318.00
As of December 31, 1944, there was a balance of surplus of $2,325.54, and as of December 31, 1945, of $2,299.69. Petitioner incurred the following operating expenses other than officers' salaries during the taxable years: 1944
1945
Repairs
$ 283.83
$ 76.53
Interest
3,264.37
3,180.66
Taxes
4,610.54
4,502.90
Light, Heat, Power
and Water
697.18
865.11
Insurance
331.49
235.08
Legal and Accounting
850.00
415.00
Miscellaneous Expenses
10.00
135.59
*24 In each of the years 1944 and 1945 Eudora's salary was $6,200. This was the same rate which Stanley had been paid at the beginning of 1943 prior to his death. The salary for the position had ranged from $1,500 in 1923, to as high as $8,000 for the period 1936 to 1940. Eudora, as petitioner's president, supervised repairs, collection of rents, and payment of petitioner's expenses. She also signed all of petitioner's checks. The only other salary paid by petitioner was $100 per year paid to Essie M. Kiernan who became secretary of the corporation when it was incorporated in 1919 and served continuously in that office thereafter. The corporate account books, stock books, correspondence, and check books were in her care. In his will Stanley Millspaugh made the following comment about her: "I have found my faithful employee, ESSIE KIERNAN, to be very competent in the management of the financial affairs of my companies, and it is my suggestion that my trustees use all efforts to continue her employment as long as she is able to perform her duties; and I suggest that my trustees fully consult her in all financial matters and compensate her generously for her service." The salaries *25 voted Eudora and Essie in the taxable years were voted at meetings of the board of directors of petitioner held February 17, 1944 and February 23, 1945. The motions in both instances were made by John S. Sammis and seconded by Walter J. Seeley. With respect to the Tompkins Dry Goods Co., Inc., Eudora as its president received a salary of between $7,500 to $9,000 a year for both 1944 and 1945. Tompkins had annual sales of about $500,000. It ordinarily employed a force of 50 employees, but during the holiday season this rose to as high as 75 or 80. As president of the company she had responsibilities and duties typical of that office, such as financial responsibility, policy formation, responsibility for advertising and buying decisions, and the supervision of the employees. The outstanding shares of Tompkins stock were held as follows: Number of
Shares
Eudora Millspaugh and John S.
Sammis as co-trustees under the
will of Stanley Millspaugh
609
W. J. Seeley, vice president and
general manager
123
Tompkins' Treasury
41
Four (4) Employees
40
TOTAL
813
The business of both petitioner and Tompkins was conducted by Eudora in the office of Tompkins. *26 The petitioner did not sublease such space from Tompkins. Eudora was present in this office to direct the affairs of both companies each business day of the year, excluding vacations, dividing her time as appeared necessary between their affairs. The respondent disallowed portions, viz. $4,188 and $4,000, of the annual salary of $6,200 paid by petitioner to Eudora Millspaugh in 1944 and 1945. The amounts allowed by the respondent were reasonable compensation for personal services actually rendered. Opinion The sole issue presented is whether or not respondent erred in disallowing as deductions in 1944 all but $2,012.04, and in 1945 all but $2,200 of a claimed annual compensation of $6,200 for petitioner's president and chief stockholder, as in excess of reasonable compensation for personal services actually rendered. Section 23 (a) (1) (A), Internal Revenue Code. [1] Whether compensation is reasonable is essentially a question of fact. Regulations 111, section 29.23(a)-6; Botany Worsted Mills v. United States, 278 U.S. 282. Each situation must be considered as a whole. Ordinarily no single factor is decisive but it is the interplay of several *27 factors, properly weighted for the particular case, which must furnish the final answer. Thus, control of the petitioner was clearly in Eudora's hands. She held a large block of petitioner's stock in her own right and while this was not a majority, by the terms of a trust established by her husband's will she acted as co-trustee of all but one of the remaining shares and received all or almost all of the income from those shares. Since she was both beneficiary and co-trustee it is not likely that Sammis, co-trustee, would present any serious opposition to her claims for salary from the petitioner. The only competing beneficiaries would be the Millspaugh children as they reached 21. The evidence does not show whether any of these children had yet reached 21. Even if they *28 had, in the absence of evidence to the contrary, the natural presumption would be that their interests were so closely related to those of their mother, Eudora, as to present no conflict on voting decisions with regard to petitioner. In short, all evidence points to enough control of petitioner by Eudora to eliminate any serious consideration that her salary as an officer of petitioner was set by arms length bargaining. Alone, this fact, of course, would not determine the unreasonableness of the compensation paid by petitioner to Eudora, and we look for additional factors bearing on that question. Petitioner did not offer any convincing evidence that all or most business establishments of a like nature were paying similar salaries for similar work. Regulations 111, section 29.23(a)-6; Cf. Heckett Engineering, Inc. v. Commissioner, 173 Fed. (2d) 572. There was some testimony regarding one other realty corporation in Middletown, but it was in financial difficulties and paid only nominal salaries. This is not helpful to petitioner. The nature, extent, and scope of the officer's work are material. There is no evidence presented here of the quality or complexity of *29 the work done, its unique quality, if any, or of the value or intrinsic worth of the services. From the evidence offered it would not appear that the position occupied by Eudora required any particular qualifications or abilities. The business appears to be a simple one calling for no unusual training, experience, talent, ability to make complex decisions, or perform arduous or time consuming duties. The bulk of petitioner's income, some $18,000, was drawn from rent paid by Tompkins, which Eudora virtually owned and did control as its president and chief stockholder. The remaining fees were collected from properties contiguous to the building occupied by Tompkins. Petitioner has offered no evidence to show that collection of the fees and rentals presented any difficulty. In sum, Eudora's duties of paying expenses, signing checks (the number and amount of which are not in evidence), supervising what appear to be minor repairs, and collecting rents, are not in themselves persuasive of the reasonableness of her salary. Nor did Eudora devote all her time to the taxpayer's business. Cf. Miles-Conley Co., 10 T.C. 754; affirmed (4 Cir. 1949), 173 Fed. (2d) 958. *30 Eudora had other responsibilities and duties in connection with Tompkins which, in view of the nature of that business, a dry goods department store with annual sales of about $500,000 during the taxable years, must have been considerable. For these services she received $7,500 to $9,000 per annum during the years in question. No evidence of the amount of time, energy and effort she was free to devote to petitioner was offered. Cf. Affiliated Enterprises, Inc., 42 B.T.A. 390. The amounts paid to Stanley in previous periods were put in evidence. The fact, however, that Stanley, the founder and the developer of the business, received such sums is no indication that similar amounts are reasonable for Eudora. Nor was any evidence offered to indicate their relative abilities or whether the duties each performed were comparable. The petitioner offered the opinion of Sammis to the effect that he believed the sums paid were reasonable. But Sammis was not a disinterested witness. As a director of petitioner he helped set Eudora's salary. Nor were the premises for his opinion established by reference to comparative salaries or other evidence, and his opinion can be given little *31 weight. Long Island Drug Co., Inc. v. Commissioner, 111 Fed. (2d) 593; affirming 35 B.T.A. 328. After careful consideration of all the evidence we conclude that petitioner has not offered persuasive evidence of either the reasonableness of the salary paid to Eudora for the services performed, or of the unreasonableness of the amount the Commissioner has allowed. Long Island Drug Co., Inc., supra. The respondent did not err in disallowing portions of the compensation paid in 1944 and 1945 in the amounts of $4,188 and $4,000, respectively. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or business expenses. - (A) In general. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *↩